**Zuri BARNES, Plaintiff,**

v.

**BURGER KING CORPORATION, a Florida corporation, Defendant.**

**No. 94–0889–CIV.**

United States District Court,
S.D. Florida.

March 29, 1996.

Zarco & Associates, P.A. by Robert Zarco, and Robert M. Einhorn, Miami, FL, for Plaintiff.

Gallwey, Gillman, Curtis, Vento & Horn, P.A. by Don L. Horn, Miami, Florida, Whit-man Breed Abbott & Morgan, New York City, for Burger King Corporation.

### *ORDER AFFIRMING MAGISTRATE'S REPORT AND RECOMMENDATION*

UNGARO–BENAGES, District Judge.

THIS CAUSE came before the Court upon Defendant Burger King Corporation's Motion for Summary Judgment filed August 2, 1995 (D.E.124) and Defendant Burger King Corporation's Motion for Reconsideration filed October 23, 1995. (D.E.172).

THE MATTER was referred to the Honorable Ted E. Bandstra, United States Magistrate Judge. Two Report and Recommendations dated October 13, 1995 (D.E.170) and January 5, 1996 (D.E.195) have been filed, recommending that Defendant's Motion for Summary Judgment be granted as to Counts I, IV, V, VI and VII of the Complaint and denied as to Counts II and III and later recommending that Defendant's Motion for Reconsideration be granted and Count III be dismissed for failure to state a cause of action. The parties have filed Objections to the Magistrate Judge's Reports for this Court's consideration. This matter is ripe for disposition.

THIS COURT has made a *de novo* review of the entire file and record herein, and being otherwise fully advised in the premises, it is

ORDERED and ADJUDGED that United States Magistrate Judge Bandstra's Report and Recommendation of January 17, 1996 is AFFIRMED as to its recommendations regarding Defendant Burger King's Motions for the reasons set forth below.

### I. *FACTS*

This case arises out of a franchise agreement between Plaintiff Zuri Barnes ("Barnes") and Defendant Burger King Corporation ("Burger King") pursuant to which Barnes opened a Burger King restaurant in downtown Los Angeles, California. The undisputed facts are as follows.

Barnes is a sophisticated businessman who was also the franchisee of two Kentucky Fried Chicken restaurants. In or about September of 1991, Barnes and Burger King entered into negotiations for the opening of a

restaurant. Thereafter, on May 13, 1991, Barnes completed a franchise application and received Burger King's Uniform Franchise Offering Circular ("UFOC") which detailed Burger King's policies and procedures. The UFOC provides, in pertinent part:

A franchisee agrees to operate the Burger King franchised restaurant at a specific location. *A franchisee receives no radius, area or territorial exclusivity. BKC may, in its discretion, establish additional Burger King restaurants operated by BKC and/or other BKC franchisees in the vicinity of a franchisee's restaurant.* A Burger King franchised restaurant competes with other restaurant businesses which may include Burger King restaurants operated by BKC and other Burger King franchisees ...

\* \* \* \* \* \*

BKC has occasionally granted area development agreements in order to generate or expand heretofore undeveloped but potential market areas. Such agreements may only be granted, in writing, by authorization of the President of BKC for a specific term and would usually contain a strict schedule expediting the development of the area. Absent other agreed upon contractual arrangements, exclusivity would preclude the establishment of company owned or other franchisee-owned outlets in the area defined by the written document.

UFOC ¶ 12, p. 12–1 (emphasis added).

After submitting his franchise application and receiving the UFOC, Barnes expressed concerns about the possibility of other Burger King restaurants opening in close proximity to his location. Accordingly, on or about July 21, 1992, Barnes and his real estate broker, Michael G. O'Brien, met with Jeffrey G. Harding, Burger King's sales and service manager for the downtown Los Angeles area, to discuss Barnes' concerns. There is some dispute as to what, exactly, Barnes intended to accomplish at the meeting, but it is undisputed that, after that meeting, on July 21, 1992, Harding sent a letter to (hereinafter "the July 21 letter") O'Brien stating that Burger King had a "good faith policy" within the franchise community of not allowing other franchisees to develop Burger King

restaurants within a two mile radius of an existing Burger King restaurant absent "extenuating circumstances." *See* Exhibit B of the Complaint. Barnes was not copied on the letter, but Barnes received a copy of it from O'Brien before executing the Franchise Agreement.

In or about October of 1992, Charles Dooley, Burger King's Vice President, became aware of Harding's July 21 letter to O'Brien about Burger King's "good faith policy." Dooley immediately contacted Harding and advised him that Burger King had no such "two mile" policy. He then instructed Harding to write a letter to O'Brien "clarifying" Burger King's encroachment policy. On October 7, 1992, Harding wrote a letter (hereinafter "the October 7 letter") advising O'Brien that Burger King's policy did not prevent Burger King from building restaurants "wherever we feel there is a potential customer base to support the viability of all parties concerned," and that Burger King often viewed downtown communities with walking clientele different from areas where customers primarily drove to the restaurants. *See* Exhibit C of the Complaint. It is undisputed that Barnes was not copied on this letter, although there is some dispute as to whether Harding was specifically instructed not to copy Barnes. Harding has testified that Dooley specifically told him not to send a copy of the October 7 letter to Barnes. Barnes has testified that he did not know about the October 7 letter until after he signed the Franchise Agreement and completed construction of the his Burger King franchise, and he further testified that he would not have proceeded with construction of his franchise if he had known that Burger King had any plans to permit other Burger King franchises in the vicinity of his restaurant.

On December 11, 1992, Barnes signed the Franchise Agreement with Burger King without the assistance of an attorney. The Franchise Agreement provides, in pertinent part:

BKC grants to FRANCHISEE and FRANCHISEE accepts a franchise for a period of Twenty (20) years to use the Burger King System and the Burger King

Marks only in the operation of a Burger King Restaurant ("Franchised Restaurant") at 710 South Broadway, Los Angeles, California ... *This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to FRANCHISEE.*

\* \* \* \* \* \*

This Agreement, together with the Franchise Application, Management Commitment Form and Capitalization Plan submitted by FRANCHISEE to BKC upon which BKC is relying in granting this franchise, *constitute the entire agreement of the parties and supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.*

Franchise Agreement ¶¶ 1, 19(K); *see* Exhibit A of the Complaint.

During the time that Barnes was in the process of negotiating and finalizing his franchise plans with Burger King, Burger King was negotiating with Jay and Clara Shin. Mr. Shin testified that he and his wife, who already owned one Burger King franchise together, had advised Burger King that they were interested in expanding and that, in approximately August of 1992, they informed David Kautz, a Burger King Development Manager, that they were interested in opening a Burger King restaurant in downtown Los Angeles, approximately five blocks from Barnes' location. In September of 1993, Burger King advised Barnes in writing that it anticipated its approval of the Shin franchise five blocks from his location in downtown Los Angeles. Barnes objected in a letter to Burger King on September 17, 1993 stating that the encroaching restaurant would have an impact of as much as 50% on his business. Burger King eventually informed Barnes in late January of 1994 that, "given all the facts," it believed that Barnes' concerns about the Shin restaurant were not justified. The Shin franchise opened in July, 1994. Subsequently, in June, 1995, Barnes closed his Burger King restaurant claiming he was forced to do so because of substantial losses sustained as a result of the opening of the Shin Burger King.

## II. PROCEDURAL BACKGROUND

On May 5, 1994, Barnes filed a Complaint for Preliminary Injunctive Relief, Permanent Injunctive Relief and Damages against Burger King. The Complaint consists of eight counts against Burger King: (1) Fraud in the Inducement; (2) Violation of the Florida Franchise Act; (3) Violation of the Florida Sale of Business Opportunities Act; (4) Breach of the Implied Covenant of Non–Competition; (5) Breach of the Implied Covenant of Good Faith and Fair Dealing; (6) Breach of Contract; (7) Promissory Estoppel; and (8) a Request for Preliminary and Permanent Injunctive Relief. The undersigned entered an Order on Barnes' Motion for Preliminary Injunctive Relief on September 19, 1994, affirming the Magistrate Judge's Report and Recommendation and denying Barnes' motion on the grounds that Barnes had not satisfied the four requisite elements for preliminary injunctive relief, specifically, Barnes had not made a sufficient showing of irreparable harm. *See* D.E. 57.

Subsequently, on August 2, 1995, Burger King filed the Motion for Summary Judgment now before the Court. The Magistrate Judge issued a Report and Recommendation, dated October 13, 1995, recommending that Burger King's Motion be granted as to Counts I, IV, V, VI and VII and denied as to Counts II and III ("the October 13 Report"). Burger King then moved, on October 13, 1995, for reconsideration as to Counts II and III upon which the Magistrate Judge issued a Supplemental Report and Recommendation, dated January 5, 1996, recommending that Count II of the Complaint be dismissed for failure to state a claim ("the January 5 Report"). The Court will address Counts I–VII of the Complaint below.

## III. LEGAL STANDARD

The procedure for disposition of a summary judgment motion is well established. Summary judgment is authorized only when:

the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In applying this standard, the *Adickes* Court explained that when assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Id.*

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir.1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir.1982).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160, 90 S.Ct. at 1609–10. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir.1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

## IV. *LEGAL ANALYSIS*

At the outset, the Court points out that it is cognizant of Barnes' general objections to the Magistrate Judge's Report. Barnes argues that the Magistrate Judge did not view all of the facts in the light most favorable to the non-moving party, as required under the standard for reviewing motions for summary judgment dictated above. This Court has conducted a *de novo* review of the entire file and record, including the Magistrate Judge's Reports and reaches the following conclusions having viewed all of the facts presented in the light most favorable to Barnes, the non-moving party. The facts are discussed below as they pertain to each individual Count.

### A. *Count I: Fraud In The Inducement*

█ In Count I of the Complaint, Barnes alleges that Burger King is liable to him for fraud in the inducement of the Franchise Agreement. The elements of a claim for fraud in the inducement in Florida are: (1) that the defendant misrepresented a material fact; (2) that the defendant knew or should have known that the statement was false; (3) that the defendant intended that the representation would induce the plaintiff to enter into a contract or business relation; and (4) that the plaintiff was injured by acting in justifiable reliance on the misrepresentation. *Jankovich v. Bowen*, 844 F.Supp. 743, 747 (S.D.Fla.1994); *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985).

Barnes alleges that Burger King represented to him, through Harding, that Burger King would not open any other Burger King

restaurants in the vicinity of Barnes' restaurant and that Burger King had a "good faith policy" of not allowing Burger King restaurants to be opened within two (2) driving miles and one (1) walking mile of each other ("the encroachment policy"). In his Objections to the Magistrate Judge's Report and Recommendation, Barnes further alleges that Burger King also misrepresented its encroachment policy by concealing from him the October 7th letter from Harding to O'Brien and fraudulently concealed that an additional franchise, the Shin restaurant, was going to open within five blocks of his restaurant. Barnes alleges that Burger King was aware, at the time it made these representations, that Barnes would not proceed with his plans absent the assurances contained in the July 21 letter such that Burger King made the representations with the intent to induce him to proceed with his plans. Finally, Barnes alleges that he did, in fact, rely on Burger King's representations and the absence of knowledge of the October 7th letter or the Shins' plans in deciding to enter into and proceed with the Franchise Agreement.

In its Motion for Summary Judgment, Burger King argues that Barnes' claim based on the alleged representations regarding the encroachment policy must fail because they were made prior to execution of the Franchise Agreement which contains a merger clause and does not contain any assurances consistent with the July 21 letter. In addition, Burger King argues that Barnes' reliance on representations regarding the encroachment policy was unreasonable given that two other Burger King restaurants were already located within two miles of Barnes' franchise location, and that Burger King restaurants across the country are located within two miles of each other. Finally, Burger King argues that Harding's representations cannot be the basis for a fraud claim because Harding believed they were true when he made them. Barnes responds Burger King, being aware that materially false statements about the encroachment policy had been made in writing, had a duty to determine whether Barnes had seen them or was relying on them and a duty to clarify its position on the matter with Barnes directly. Barnes also asserts that the merger clause is ineffec-

tive where the contract containing it was induced by fraud and that a merger clause does not apply to claims based on omissions. Barnes further asserts that Burger King was under a duty to disclose the Shin negotiations because Barnes did not have the ability to learn of them himself.

The Magistrate Judge recommended that Burger King's Motion be granted with respect to Count I on the grounds that Barnes' reliance on the alleged misrepresentations was not reasonable or justifiable as a matter of law. The Magistrate Judge relied on the fact that the alleged misrepresentations were made before execution of the Franchise Agreement which explicitly states that there is no such policy and which contains a merger clause. The Magistrate Judge further found that Barnes presented no claim for fraud based on the alleged concealment of the Shin negotiations because Burger King was not under a duty to disclose such plans to Barnes. Finally, the Magistrate Judge found that Barnes' reliance on the alleged misrepresentations regarding the encroachment policy was unreasonable because such representations were inconsistent with the obvious facts, namely the existence of two other Burger King restaurants within two miles of Barnes' restaurant. Barnes objects to the Magistrate Judge's Report on several grounds, as follow.

1. *Fraud Through Concealment of Burger King's Encroachment Policy*

Barnes argues that the Magistrate Judge erred in recommending that judgment as a matter of law be granted in favor of Burger King on this claim because there are genuine issues of material facts regarding whether Dooley instructed Harding not to copy Barnes on the October 7 letter or whether he simply did not tell Harding to copy Barnes on the letter. Barnes argues that this question presents a disputed issue of material fact concerning whether Burger King fraudulently concealed its encroachment policy, and, therefore, this dispute should bar summary judgment.

■ This Court finds that the factual dispute over whether Dooley instructed Harding not to copy Barnes or simply did not

instruct Harding to copy Barnes on the letter does not preclude entry of a judgment as a matter of law because it does not present a genuine issue of material fact. "In order to avoid the grant of a summary judgment, a party must demonstrate both the existence of a material fact and a genuine issue as to that material fact. A fact is material if it constitutes a legal defense to an action." *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir.1980). In this case, the disputed fact is not material in that, no matter how it is resolved, it does not affect this Court's findings as a matter of law. Viewing all of the facts in the light most favorable to Barnes, the Court finds as a matter of law that Burger King fully disclosed its encroachment policy to Barnes in both the UFOC and the Franchise Agreement. Whether Dooley attempted to conceal the October 7 letter from Barnes is immaterial because all of the information contained in that letter regarding the encroachment policy is contained in the UFOC and the Franchise Agreement. Furthermore, as Burger King points out, to the extent that Barnes' claim is based on reliance on the July 21 letter from Harding, the claim must fail because, as discussed below, reliance on that letter is unreasonable as it flatly contradicted the terms of the UFOC and the Franchise Agreement in addition to the obvious facts. *See Schubot v. McDonalds Corp.*, 757 F.Supp. 1351 (S.D.Fla.1990), *aff'd* 963 F.2d 385 (11th Cir.1992) (finding plaintiff's reliance on defendants' alleged misrepresentations unreasonable because the statements were not contained in the subsequent written agreement).

Thus, Barnes' argument that Burger King is not entitled to judgment as a matter of law on the grounds that there are genuine issues of material fact regarding Dooley's directives with respect to the October 7 letter must fail. The Court finds, as a matter of law, that the undisputed facts viewed in the light most favorable to Barnes, indicate that Burger King did not conceal its encroachment policy because it was fully disclosed in the USOC and Franchise Agreement.

### 2. *Reliance on the July 21 Letter*

Barnes argues that the Magistrate Judge erred in finding that Barnes' reliance on the July 21 letter was unjustifiable on the grounds that the terms of the July 21 letter did not contradict the terms of the UFOC, that a merger clause is inapplicable where the contract in which it is contained was induced by fraud, and that the language of the July 21 letter is not inconsistent with the existence of two other Burger King restaurants within two miles of his location. This Court finds, consistent with the Magistrate Judge's report, that Barnes' reliance on the terms of the July 21 letter was unjustifiable as a matter of law.

### a. *The July 21 Letter and The Terms of the UFOC and Franchise Agreement*

■ Barnes argues that "[t]he Magistrate Judge determined that since the UFOC granted franchisees no exclusive territory, BARNES could not have justifiably relied on the July 21st letter." Plaintiff's Objections at 9 (*citing* R & R at 11–12). However, upon review of the Magistrate Judge's Report, the Court finds that the Magistrate Judge did not rely solely on the terms of the UFOC in determining that Barnes' reliance was unjustifiable. Rather, the Magistrate Judge also relied on the terms of the Franchise Agreement:

> The Franchise Agreement provided, in clear and uncertain [*sic*] terms, that Barnes' franchise was for a specific location only and that BKC did not "in any way grant or imply any area, market or territorial rights" to Barnes. Franchise Agreement, ¶ 1. The Franchise Agreement further provided that the agreement, together with the franchise application, management commitment form and capitalization plan, constituted "the entire agreement of the parties and supersedes all prior negotiations, commitments, representations, and undertakings of the parties with respect to the subject matter of this Agreement." Franchise Agreement, ¶ 19(k). Barnes, in signing the Franchise Agreement, acknowledged that he was entering the agreement
>
> ... after having made an independent investigation of BKC's operations and not upon any representations as to the profits and/or sales volume which [Barnes] might be expected to realize,

*nor upon any representations or promises by BKC which are not contained in this Agreement.*

Franchise Agreement, Intro. ¶ E (emphasis added).

Having read and executed the Franchise Agreement containing these provisions, Barnes cannot now argue that he reasonably relied on BKC's prior representation or promises concerning its "good faith policy" . . .

\* \* \* \* \* \*

In this case, Barnes signed a Franchise Agreement in which he acknowledged that BKC was not promising him an exclusive territory. The Franchise Agreement was consistent with the UFOC previously provided to Barnes which also stated that BKC granted no exclusive territory . . . Thus the undersigned finds that any reliance by Barnes on the July 21 letter or any other oral representations or promises by BKC prior to execution of the Franchise Agreement was not reasonable or justifiable as a matter of fact or law . . .

R & R at 10–12 (*citing Schubot,* 757 F.Supp. at 1356; *Durkee v. Goodyear Tire & Rubber Co.,* 676 F.Supp. 189 (W.D.Wis.1987)).

■ This Court agrees with the Magistrate Judge that reliance by Barnes on the July 21 letter was unreasonable and unjustifiable for the following reasons. The unambiguous terms of the subsequent Franchise Agreement between Barnes and Burger King clearly contradict with the terms of the July 21 letter. The Franchise Agreement in no uncertain terms states that Barnes was not entitled to any area, market or territorial rights. Therefore, an encroachment policy, as described in the July 21 letter, was not contemplated in the Franchise Agreement and flatly contradicts the express terms of the Franchise Agreement. The Franchise Agreement explicitly states that, other than the franchise application, management commitment form and capitalization plan, all other representations are superseded by the Franchise Agreement. Therefore, the representations contained in the July 21 letter were superseded by the Franchise Agreement and did not become part of it. Furthermore, even absent a merger clause such

as that contained in the Franchise Agreement, it is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties. *See Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir. 1984); *Schubot,* 757 F.Supp. at 1356 ("Any reliance on the defendants' alleged misrepresentations is unreasonable because the statements were not contained in the subsequent, written agreement.").

The Court also notes that, although it concurs with the Magistrate Judge that the terms of the Franchise Agreement demonstrate that Barnes' reliance on the July 21 letter was unreasonable as a matter of law, this Court has also considered Barnes' assertion that the terms of the July 21 letter are not inconsistent with the terms of the UFOC. According to Barnes, "The July 21 letter did not announce to BARNES he was granted an exclusive territory comprising of a two mile radius around his existing restaurant, but only that no *additional* (or other) BK franchisees would be permitted to open a restaurant within two miles of BARNES' restaurant." Plaintiff's Objections at 9. However, the UFOC states that "BKC may, in its discretion, *establish additional Burger King restaurants operated by BKC and/or other BKC franchisees in the vicinity of the franchisee's restaurant.*" UFOC ¶ 12 (emphasis added). Therefore, the terms of the UFOC are clearly inconsistent with the July 21 letter insofar as it assures Barnes that no *additional* Burger King franchisees would be permitted to open restaurants within a two mile radius of his restaurant.

Therefore, this Court finds that Barnes' reliance on the terms of the July 21 letter was unreasonable as a matter of law because the terms of the letter contradict the terms of the Franchise Agreement and because the representations in the July 21 letter were not contained in the subsequent written Franchise Agreement between the parties. Any other conclusion would be contrary to the plain language of the agreement between the contracting parties and would run counter to basic contract principles. Thus, any claim by

Barnes for fraudulent inducement which is based on Barnes' reliance on the July 21 letter must fail as a matter of law. However, the Court will nevertheless address Barnes' assertions regarding the applicability of the merger clause to the July 21 letter.

### b. *The Merger Clause*

Barnes argues that the Magistrate Judge erred in relying on the merger clause contained in the Franchise Agreement because a merger clause cannot negate liability where the contract containing the clause was induced by fraud. In this case, Barnes argues that the fraud inducing the contract was the fraudulent concealment of the encroachment policy and the fact that Burger King was engaged in negotiations with the Shins. The Court finds that Barnes' argument regarding the merger clause must fail because, despite the merger clause, the Court finds as a matter of law that Barnes has not presented a claim for fraudulent inducement of the Franchise Agreement for the reasons discussed herein. Thus, as the Court finds that the contract was not induced by fraud, the merger clause is enforceable. As discussed above, however, the Court need not rely on the merger clause in finding that Barnes' reliance on the July 21 letter was unjustifiable because the terms of the letter contradict the terms of the subsequent written agreement between the parties.

### 3. *Concealment of the Shin Negotiations*

Barnes argues that the Magistrate Judge erred by dismissing Barnes' argument that Burger King had a duty to disclose the plans to open the Shin restaurant because Barnes did not have an equal opportunity to become apprised of such information. Barnes concedes that Burger King did not have a fiduciary duty to inform Barnes of the Shin plans. This Court finds that Burger King was not under a duty to inform Barnes of the Shin negotiations, and, therefore, Barnes' claim that Burger King fraudulently concealed the Shin negotiations fails as a matter of law.

 Before addressing Burger King's duty to disclose, the Court notes Burger King's assertion that Barnes' claims based on fraudulent concealment were raised for the

first time in Barnes' Response to Burger King's Motion for Summary Judgment. Burger King is correct that where a party raises a new claim for the first time at such a late stage in the proceedings, such a claim is not properly before the Court. However, as the Tenth Circuit pointed out in *Evans v. McDonalds Corp.*, 936 F.2d 1087 (10th Cir. 1991), a case cited by the Defendants, "As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, 'provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.'" *Id.* at 1091. Here, the Court finds that Burger King was not prejudiced by Barnes' having raised claims for fraudulent concealment at such a late stage because Burger King was on notice from the Complaint that Barnes was claiming fraudulent concealment based on the October 7 letter and the Shin negotiations. *See, e.g.,* Complaint ¶¶ 25, 32, 33, 39, 44. The Court will, therefore, address the claim on the merits, as did the Magistrate Judge.

 Thus, the question arises, was Burger King under a duty to disclose the Shin negotiations to Barnes? Generally, a duty to disclose arises "when one party has information that the other party has the right to know because of the fiduciary or other relationship of trust or confidence between them." *State v. Marks, P.A.,* 654 So.2d 1184, 1189 (Fla. 4th DCA 1995), *reh. denied,* May 24, 1995. Barnes, however, urges the Court to extend that duty to circumstances where one party possesses information which the other party does not have an equal opportunity to ascertain. In support of this proposition, Barnes cites *Telesphere International, Inc. v. Scollin,* 489 So.2d 1152, 1154 (Fla. 3d D.C.A.1986). In *Telesphere,* an employee sued his employer for fraudulent concealment after learning that his employer knew, when hiring him, that the product he was hired to market would most likely fail and lead to the termination of his position. The court found that "[the employer] had knowledge superior to

[the employee's] about these matters and therefore—or so a jury could find—had a duty to reveal them." *Id.* at 1154 (*citations omitted*). The court, therefore, ruled that a directed verdict was not appropriate on the fraud claim.

■ The facts of the *Telesphere* case are, however, distinguishable in a significant sense from the facts now before the Court. In that case, the parties were in a special relationship of confidence inherent in the relationship between employer and employee. *See, e.g., Miller v. Allstate Ins. Co.,* 573 So.2d 24, 30 (Fla. 3d D.C.A.1990). (Other cases cited by Barnes include contracts for the sale of real estate concerning the duty of good faith and fair dealing of the seller). In the case before the Court, however, the parties are in a franchisor-franchisee relationship. It is well-settled, as conceded by Barnes, that a franchisor is not in a fiduciary relationship with a franchisee. *See George Hammersmith, Inc. v. Taco Bell Corp.,* 942 F.2d 791 (Table), 1991 WL 159466, at *4–5, 1991 U.S.App. LEXIS 19716, at *13–16 (9th Cir. July 12, 1991); *O'Neal v. Burger Chef Sys., Inc.,* 860 F.2d 1341, 1349–52 (6th Cir.1988); *Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1413–14 (7th Cir.1986). Furthermore, there is no other special or confidential relationship between franchisor and franchisee from which such a duty would arise. *See Burger King Corp. v. Austin,* 805 F.Supp. 1007 (S.D.Fla.1992). Rather, a franchisor and franchisee contract at arms' length. *See Austin,* 805 F.Supp. at 1020. As such, no court in this Circuit or in Florida has extended the duty of disclosure to this relationship. Rather, the courts have concluded that there is no duty of disclosure where the parties are negotiating at arms' length for a franchise.

This Court sees no reason why it should depart from this well established principle under the circumstances of this case. Of primary importance in reaching this conclusion is the fact that the information that Burger King is alleged to have concealed here, the details concerning Burger King's negotiations with another potential franchisee, is not a material fact that Barnes had a right to know. Rather, there are several legitimate reasons why Burger King and Shin would want the details of their negotiations to remain private, *i.e.* the Shins have an interest in protecting their negotiations for the lease of the prospective site other franchisors and franchisees, and Burger King has an interest in protecting both the financial aspects of its negotiations with a franchisee before a deal is made and in protecting the negotiations for the site from other franchisors. In addition to which, Burger King was not under any duty to inform Barnes of plans to open additional restaurants in the vicinity or to consider him as a potential franchisee for the additional locations. *See Schubot,* 757 F.Supp. at 1356. The material fact which Barnes did have a right to know, that Burger King may permit additional franchises to open in Barnes' vicinity, was disclosed to Barnes in the UFOC and the Franchise Agreement, as discussed in Section IV, A, 1, *supra.* Furthermore, Barnes was aware of the competitive nature of the franchise business, owning two Kentucky Fried Chicken franchises before doing business with Burger King. As discussed above, by entering into a franchise relationship with a party, a franchisor does not obligate itself to disclose all negotiations which it undertakes in its franchise business. *See O'Neal,* 860 F.2d at 1351 (franchisor not obligated to disclose that parent corporation negotiating to sell franchise chain: "Plaintiff was done in by competition in the market place—not General Foods' failure to keep them abreast of its long-range corporate projections.") Barnes presents no reason to extend the duty of disclosure to Burger King's negotiations with the Shins under the circumstances presented here.

### 4. *Conclusion*

Based on the foregoing, this Court finds that Count I of Barnes' Complaint for Fraudulent Inducement fails as a matter of law because the undisputed facts, viewed in the light most favorable to Barnes, indicate that Burger King did not conceal its encroachment policy from Barnes, that Barnes' reliance on the July 21 letter concerning Burger King's alleged encroachment policy was unjustifiable, and that Burger King was not under a duty to disclose the details of the Shin negotiations to Barnes. Therefore, the Magistrate Judge's October 13 Report and Recommendation is AFFIRMED as to Count

I of the Complaint, and Burger King's Motion for Summary Judgment is GRANTED as to Count I.

### B. Count II: Violation of the Florida Franchise Act

In Count II of the Complaint, Barnes alleges Burger King violated Fla.Stat. § 817.416(2)(a) "by purposefully misrepresenting material facts with the intent to induce BARNES to enter into a Franchise Agreement with BKC." Complaint at ¶ 48. § 817.416(2)(a)(3) provides:

> (a) It is unlawful, when selling or establishing a franchise or distributorship, for any person:
> 3. Intentionally to misrepresent or fail to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect the market or market area for the particular franchise or distributorship to sustain.

Specifically, Barnes claims that Burger King violated the Act by intentionally misrepresenting to Barnes that Burger King would not open any other Burger King restaurants in the vicinity of Barnes' restaurant and that Burger King had a good faith encroachment policy as discussed above. Barnes further alleges that Burger King reinforced its misrepresentations by sending the July 21 letter discussed above to Barnes and by causing the October 7 "clarifying" letter not to be sent to Barnes. Complaint ¶¶ 49–50.

In its Motion for Summary Judgment, Burger King argues that Barnes' claims under § 817.416 must fail because, to recover under the Act, "a franchisee must demonstrate 'proof of intentional words or conduct by the franchisor ... *which were relied upon by the franchisee* to his detriment, and which are not in accordance with the facts.'" Burger King Motion for Summary Judgment at 19, citing *Travelodge Int'l, Inc. v. Eastern Inns, Inc.*, 382 So.2d 789, 791 (Fla. 1st D.C.A.1980) (emphasis added). Burger King further argues that "'[t]he law is clear that reliance by a party claiming fraud must be reasonable and justified under the circumstances.'" Burger King Motion for Summary Judgment at 19, citing *Smith v. Mellon Bank*, 957 F.2d 856, 858 (11th Cir.1992) (ap-

plying § 817.41 of the Florida Fraudulent Practices Act, a related statute). According to Burger King, Barnes cannot establish that he reasonably relied on any alleged representations regarding the alleged encroachment policy. Barnes simply responds that Burger King's Motion is meritless because the evidence establishes that Burger King both intentionally misrepresented its policies with regard to opening additional restaurants and purposefully failed to disclose its efforts with respect to the Shin restaurant.

In the October 13 Report, the Magistrate Judge recommended that Burger King's Motion for Summary Judgment be denied as to Count II on the grounds that the Act creates a duty to disclose on Burger King's part with respect to the Shin restaurant, unlike the common law fraud claim, and Barnes has presented sufficient evidence of Burger King's failure to disclose evidence regarding Burger King's intention to open another Burger King restaurant in the vicinity of Barnes' restaurant, even apart from any alleged misrepresentations, to create an issue of fact that precludes entry of summary judgment. October 13 Report at p. 15. Burger King objects to the Magistrate Judge's Report primarily arguing that the decision to open the Shin restaurant was not made until many months after Barnes opened his restaurant such that Burger King did not fail to disclose a material fact *while selling or establishing* the Barnes franchise. Burger King further asserts that there is no evidence that Burger King did not believe that the market area could not sustain both the Barnes and Shin restaurants such that there is no evidence of an intentional misrepresentation by Burger King. Finally, Burger King argues that the failure to disclose the mere possibility that they may open the Shin restaurant does not amount to a material misrepresentation. Barnes responds that there are material issues of fact regarding the application of the Act and the Shin negotiations.

This Court agrees with the Magistrate Judge that there are genuine issues of material fact which preclude judgment as a matter of law for the following reasons.

### 1. *Burger King's Duty to Disclose Under § 817.416(2)(a)3.*

This Court agrees with the Magistrate Judge that the duty imposed by the Florida Act differs significantly from the duty imposed by common law. The Florida Act imposes a duty on the franchisor to disclose "efforts to sell or establish more franchises or distributorships than is reasonable to expect the market or market area for the particular franchise or distributorship to sustain." § 817.416(2)(a)3. Thus, whereas the line of cases developing claims for fraud under the common law narrows the mandated disclosures to facts material to the contract at issue, leaving out mere possibilities and facts that the defendant may not think are relevant, the Florida Act broadens the scope of information which must be disclosed to include *efforts to sell or establish more franchises* and imposes an *objective* standard of relevancy. Barnes argues, and this Court agrees, that Burger King has misinterpreted the Florida Act and its application to the circumstances presented here.

### 2. *Chronology of The Shin Negotiations*

■■■ Burger King claims that it is entitled to judgment as a matter of law because the Act requires that the franchisor intentionally fail to disclose efforts to sell additional franchises at the time the franchisee was establishing its restaurant, whereas the Shins did not formally apply for approval and Burger King did not approve the Shin franchise until 1993, after Barnes had established his franchise. Burger King's claim on these grounds is problematic for two reasons. First, Burger King appears to overlook the fact that the statute encompasses "*efforts* to sell or establish more franchises." Therefore, the fact that there was no formal application before 1993 does not eliminate the need for inquiry as to whether there were *efforts* by Burger King to proceed with the establishment of the Shin franchise.[1] Second, with regard to the inquiry into whether there were efforts by Burger King before Barnes' franchise was established, the parties have presented conflicting accounts of the chronology of the

Shin negotiations and their witnesses have presented conflicting testimony. Most significantly, Mr. Shin's deposition testimony indicates that negotiations for their downtown franchise began in early or mid-1992, whereas Mr. Kautz's testimony indicates that Burger King was unaware of the Shins' interest in a downtown franchise until 1993. These factual disputes are directly material to the decision as to whether Burger King violated the Act by failing to disclose the Shin negotiations to Barnes earlier than it did and must be presented to a trier of fact for review. As such, judgment as a matter of law is barred.

### 3. *Burger King's Subjective Belief*

Burger King argues that the Act does not impose strict liability because misrepresentations must be made knowingly under the Act. Specifically, Burger King argues that the Act requires that the franchisor intentionally misrepresent efforts to establish franchises and "that the defendant franchisor did not reasonably expect that the market or market area could sustain the additional franchises." Burger King Objections (D.E.178) at 12. Therefore, Burger King asserts that its failure to disclose the Shin negotiations to Barnes were not violative of the Act because Burger King believed that the market could sustain both the Shin and the Barnes restaurant. Again, it appears that Burger King has misinterpreted the Act. The inquiry presented by the Act is not whether the defendant franchisor subjectively believed that the market could sustain both franchises, but, rather, it is an objective inquiry of whether it was reasonable to expect that. This is clear from the plain language of the Act which reads, once again, "(a) It is unlawful ... 3. Intentionally to misrepresent or fail to disclose efforts to sell or establish more franchises ... *than is reasonable to expect the market* ... to sustain.*" Burger King has presented statistics indicating that it may have been reasonable to believe that the area could sustain both franchises, and Barnes has presented evidence to the con-

---

1. The Court notes that Burger King also argues that the Act does not mandate disclosure of "mere possibilities." The Court disagrees. The Act unambiguously encompasses "efforts to establish franchises" which plainly indicates the stages of negotiation prior to definite agreement.

trary. Thus, the Court is presented with another question of material fact which must be presented to a trier of fact for resolution and which precludes the entry of judgment as a matter of law.

### 4. *Conclusion*

Based on the foregoing, this Court finds that Count II of Barnes' Complaint for Violation of Florida's Franchise Act presents genuine issues of material fact. Therefore, the Magistrate Judge's October 13 Report and Recommendation is AFFIRMED as to Count II of the Complaint, and Burger King's Motion for Summary Judgment is DENIED as to Count II.

### C. *Count III: Violation of Florida Sale of Business Opportunities Act*

In Count III of the Complaint, Barnes alleges that Burger King violated Fla.Stat. § 559.809(3) "by purposefully misrepresenting its encroachment policy to BARNES and failing to disclose its efforts to establish more Burger King franchises than it is reasonable to expect the subject market area to sustain." Complaint at ¶ 55. Barnes further alleges that Burger King violated Fla.Stat. § 559.809(9) "by awarding another Burger King franchise in the same territory within which it represented and promised to BARNES that it would not permit such additional franchises." Complaint at ¶ 56. According to Barnes, Burger King reinforced its misrepresentations by sending the July 21 letter to Barnes and concealing the October 7 letter from him.

In its Motion for Summary Judgment, Burger King asserts that the Florida Sale of Business Opportunities Act ("FSBOA") does not apply in this case on the grounds that the sale of the franchise to Barnes is exempt under the Act. Specifically, Burger King cites § 559.802, entitled "*Franchises: exemption,*" pursuant to which a franchise is exempt from the Act if it meets the definition of franchise set out in the Federal Trade Commission ("FTC") regulations, 16 C.F.R. § 436.1 *et seq.* *See* Fla.Stat.Ann. § 559.802(1) (West Supp.1995). Burger King argues that Barnes' purchase of the franchise here meets that definition. Furthermore, Burger King argues that Barnes' purchase of the franchise does not constitute a "business opportunity" within the meaning of the Act such that it cannot form the basis for a claim under the Act. Barnes responds that the exemption does not apply because it did not become effective until July 1, 1993, and there is no indication that it may be applied retroactively. Barnes further responds that his purchase of the franchise does fall within the definition of a "business opportunity" under the Act because Burger King sells restaurants, not marketing programs.

The definition of "business opportunity" at issue here is found at § 559.801 and reads, in pertinent part:

> For the purpose of ss. 559.80–559.815, the term:
>
> (1)(a) "Business opportunity" means the sale or lease of any products, equipment, supplies, or services which are sold or leased to a purchaser to enable the purchaser to start a business for which the purchaser is required to pay an initial fee or sum of money which exceeds $500 to the seller, and in which the seller represents:
>
> \* \* \* \* \* \*
>
> 4. That the seller will provide a sales program or marketing program that will enable the purchaser to derive income from the business opportunity, *except that this paragraph does not apply to the sale of a sales program or marketing program made in conjunction with the licensing of a trademark or service mark that is registered under the laws of any state or of the United States.*

Fla.Stat.Ann. § 559.801(1)(a) (West Supp. 1995) (emphasis added). Before the 1993 amendments, subparagraph 4 was designated as (d). Otherwise, the text of the paragraph remained unchanged.

In the October 13 Report, the Magistrate Judge recommended that Burger King's Motion be denied with respect to Count III on the grounds that the exception to the FSBOA for franchises cited by Burger King became effective after Barnes signed the Franchise Agreement and is not to be applied retroactively. Furthermore, the Magistrate Judge found that the definition of "busi-

ness opportunity" relied upon by Burger King also did not become effective until after Barnes signed the Franchise Agreement and is not to be applied retroactively. Burger King objects to the Magistrate's Report and asserts that the Magistrate erred in reading § 559.801 and its Statutory and Historical Notes. Burger King argues that the July 1, 1993 amendments referred to by the Magistrate Judge were not substantive changes and only redesignated the provisions which were previously numbered (1)(a)–(d) and were redesignated as (1)(a)1–4. The provision, according to Burger King contained the applicable exception both before and after the amendments referred to by the Magistrate Judge. Although Barnes does not argue against Burger King's position that the exception applied before the 1993 amendments, Barnes asserts that the sale falls within the FSBOA definition of "business opportunity" because Burger King franchises fast food hamburger restaurants not "marketing programs." *See* Plaintiff's Response to Defendant's Objections at p. 10.

Before Burger King filed its Objections to the Magistrate Judge's October 13 Report, however, Burger King filed a Motion for Reconsideration of so much of the Magistrate Judge's Report as it related to Count III in which Burger King asserts the same arguments set forth in its Objections to the Magistrate Judge's October 13 Report. In his Response to Burger King's Motion for Reconsideration, Barnes concedes that the Magistrate Judge erred in reading the Statutory Notes regarding the 1993 amendments, but Barnes again asserts that the sale of the franchise here does fall within the definition of "business opportunity" under the Act and that this conclusion is bolstered by the fact that, in 1993, the Florida Legislature also provided a separate provision exempting franchises from the Act which amendment would be superfluous if the definition of "business opportunity" already excluded franchises. According to Barnes, if the Legislature had intended to exempt franchisors form the Act, it would have specifically done so earlier. Burger King replies that the exception from the definition of "business

opportunity" does not apply to all franchise sales as not all are made in conjunction with the licensing of a registered trademark or service mark.

In a Supplemental Report and Recommendation dated January 5, 1996, the Magistrate Judge agreed with Burger King that the exception to the definition of "business opportunity" at issue here was a part of the Act before the amendments and further found that the sale of the Burger King franchise to Barnes falls within the exception which was recognized to exclude most franchises before the 1993 amendments. *See* Supplemental Report at 3–4 (*citing Batlemento v. Dove Fountain, Inc.*, 593 So.2d 234 (Fla. 5th D.C.A.1991) (the "take-out" provision of the definition of "business opportunity" in the FSBOA excludes franchises); *see also* Maura T. Smith, Esq., *Florida Franchise Law*, Fla. B.J., March 1991, at 42). Therefore, the Magistrate Judge found that Barnes presents no cognizable cause of action under the FSBOA and recommends that Count III of the Complaint be dismissed. No Objections to the Supplemental Report and Recommendation were filed.

■ This Court agrees with the Magistrate Judge's Supplemental Report that the sale of the Burger King to Barnes falls under the definition of "business opportunity" provided in § 559.801(1)(a)4, and that the provision in that paragraph excepting "the sale of a sales program or marketing program made in conjunction with the licensing of a trademark or service mark that is registered under the laws of any state or of the United States" applies to the sale. Thus, as the FSBOA applies to the sale of business opportunities, and as the sale at issue in this matter is excepted from the definition of "business opportunity" provided in the Act, the FSBOA does not apply to the sale of the franchise from Burger King to Barnes. Therefore, Barnes' claim under the FSBOA fails as a matter of law. Accordingly, the Magistrate Judge's Supplemental Report and Recommendation dated January 5, 1996 is AFFIRMED,[2] and Burger King's Motion for

---

**2.** The Court notes that the Magistrate Judge recommends dismissal of the FSBOA claim for fail-

ure to state a cause of action. However, this Court grants judgment as a matter of law in

Summary Judgment is GRANTED as to Count III of the Complaint.

### D. *Count VI: Breach of Contract*

In Count VI of the Complaint, Barnes alleges that Burger King breached both its express and implied obligations under the Franchise Agreement between the parties when it advised Barnes of its intent to permit another Burger King franchise to open in the vicinity of Barnes' franchise. Complaint at ¶ 68. In its Motion for Summary Judgment, Burger King asserts that Barnes' claim for breach of contract fails as a matter of law because Barnes has not and cannot identify any express contractual provision that was breached by Burger King because there is no provision in the Franchise Agreement which would prevent Burger King from authorizing the opening of the Shin restaurant. *Citing Burger King Corp. v. Weaver,* 798 F.Supp. 684, 688 (S.D.Fla.1992). Barnes responds that by opening the Shin franchise, Burger King has acted in contravention of Barnes' express and fundamental right under the Franchise Agreement to enjoy "the benefits to be derived from being identified with and receiving a Franchise from BKC and being able to utilize the Burger King System and the Burger King Marks which BKC makes available to its Franchisee." Plaintiff's Response to Motion for Summary Judgment at p. 21, *citing* Franchise Agreement at p. 1, ¶ D (hereinafter referred to as "¶ D").

The Magistrate Judge recommends granting Burger King's Motion finding that Barnes failed to identify any express or implied provision of the Franchise Agreement or cite to any evidence in the record which would entitle Barnes to relief on a breach of contract claim. The Magistrate Judge further found that the provision of the Franchise Agreement cited by Barnes, ¶ D, merely refers to "benefits" recognized by Barnes as a Burger King franchisee and does not create any contractual rights for Barnes or obligations by Burger King on which a breach of contract claim might be based. Barnes objects to the Magistrate Judge's

Report on the grounds that gross revenues and sales are "benefits" derived from being identified with the Burger King name and marks, and, by opening the Shin restaurant, Burger King devastated Barnes' sales and breached ¶ D of the Franchise Agreement and denied Barnes the right to enjoy the fruits of the contract. Burger King responds that ¶ D does not grant Barnes the right to prohibit Burger King from opening or allowing a franchisee to open another restaurant, and it does not grant Barnes a right to a guaranteed level of sales or revenues. Rather, ¶ D "is merely an introductory paragraph in which Barnes states that he recognizes the benefits to be derived from being identified with BKC." Defendant's Response to Plaintiff's Objections at p. 19. As such, Burger King argues, Barnes cannot claim breach of any express contractual provision. *Citing Weaver,* 798 F.Supp. at 688 (finding that the Burger King Franchise Agreement does not contain express language that would prevent Burger King from granting anyone the right to operate a competing franchise).

■ This Court agrees with the Magistrate Judge that there is no express provision in the contract that would prohibit Burger King from opening or allowing to open another Burger King in the vicinity of Barnes' restaurant. The provision cited by Barnes, ¶ D, does not set forth any obligations on Burger King's part. ¶ D provides:

> FRANCHISEE recognizes the benefits to be derived from being identified with and receiving a Franchise from BKC and being able to utilize the Burger King System and the *Burger King Marks which BKC makes* available to its Franchisees.

Franchise Agreement, p. 1, ¶ D. This Court finds, as Burger King argues, that this provision serves as an acknowledgment by the franchisee, Barnes, that he recognizes the benefits to be derived from identification with the Burger King Marks. It does not, however, impose any obligation on Burger King to assure that the franchisee is afforded all of those (unidentified) benefits. Aside

---

favor of the Defendant as Burger King moved for Summary Judgment rather than dismissal and because this Court finds that the deficiency in the

claim cannot be cured by rewording of the pleading on amendment.

from this paragraph, Barnes cites no other provision in the Franchise Agreement which has allegedly been breached by Burger King's conduct with respect to the Shin restaurant. Upon review of the Franchise Agreement, this Court finds that there is no provision prohibiting Burger King from opening other restaurants in the vicinity. In reaching this conclusion, this Court agrees with Judge Aronovitz' reading of the same Burger King Franchise Agreement in *Weaver, supra.* In granting Burger King's motion for summary judgment and dismissing the franchisee's claim for breach of contract against Burger King on the Franchise Agreement, Judge Aronovitz held, "[The Franchise Agreement] contains no *express* language which would prevent BKC from granting anyone the right to operate a competing franchise ..." *Weaver,* 798 F.Supp. at 688.[3]

There being no express provision in the Franchise Agreement prohibiting Burger King from opening additional franchises in the vicinity of Barnes' franchise, this Court finds that Burger King is entitled to judgment as a matter of law on Barnes' Breach of Contract claim against it. The Court is cognizant that Barnes' breach of contract claim also alleges breach of implied provisions of the Franchise Agreement. However, this Court finds that said allegations are duplicative of the claims set forth in Count V alleging Breach of the Implied Covenant of Good Faith and Fair Dealing. *See Weaver,* 798 F.Supp. at 688 (finding that franchisee's allegation that the agreement also contained implied conditions was merely a different way of saying that the parties are obligated to "cooperate" in their performance in "good faith" to the extent necessary to carry out the purposes of the contract such that the allegation was duplicitous given the claim for breach of covenant of good faith and fair dealing and could not remain). Therefore, Barnes' claim against Burger King for breach of the implied terms of the contract also fails as a matter of law.

**3.** In a later opinion on the same facts, Judge Marcus reaffirmed Judge Aronovitz' position with respect to the Franchise Agreement: "Weaver has not and cannot claim breach of any

Accordingly, the Magistrate Judge's October 13 Report and Recommendation is AFFIRMED as to Count VI of the Complaint, and Burger King's Motion for Summary Judgment is GRANTED as to Count VI.

### E. *Count IV: Breach of the Implied Covenant of Non–Competition*

In Count IV of the Complaint, Barnes alleges that Burger King breached the implied covenant of non-competition between the parties by opening another Burger King franchise which competes with Barnes' franchise (the Shin restaurant). According to Barnes, the sale of the franchise to him by Burger King gave rise to the implied covenant under which Burger King impliedly agreed not to compete with Barnes' franchise either directly or indirectly. Complaint at ¶¶ 60–61. In its Motion for Summary Judgment, Burger King argues that Barnes' claim based on the implied covenant of non-competition must fail as a matter of law because the covenant cannot be read into the agreement between the parties where it contradicts the express language provided in the agreement. As discussed in Section IV, A, *supra,* the agreement between the parties unambiguously provides that Burger King granted no exclusive area, market or territorial rights to Barnes.

The Magistrate Judge found that "such a covenant could not be implied by any language in the Franchise Agreement which expressly provides that Barnes was granted *no* exclusive territory or market area ... Under Florida contract law, a condition or obligation will not be implied which directly conflicts or is in derogation of the expressed terms of the parties' agreement." October 13 Report at p. 22 (*citing Dickey v. Holiday Inns of America, Inc.,* 226 So.2d 406, 407 (Fla. 4th D.C.A.1969)); *Broad v. Rockwell International Corp.,* 642 F.2d 929, 957 (5th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Thus, the Magistrate Judge recommended that Burger King's Motion be granted because "[h]aving

express contractual provision in this case." *Burger King Corp. v. Weaver,* CASE NO. 90–2191– CIV–MARCUS (S.D.Fla. Sept. 18, 1995), *reh'g denied,* December 20, 1995.

agreed that he had no exclusive territory, Barnes cannot now be permitted to proceed against BKC on an implied non-competition covenant which is in derogation of the express terms of the Franchise Agreement." October 13 Report at p. 22–23. Barnes has not filed Objections to the Magistrate's Report regarding the implied covenant of non-competition. Barnes' Objections regarding the implied covenant of good faith and fair dealing are discussed in section IV, F, *infra.*

This Court agrees with the Magistrate Judge that Barnes' claim based on the implied covenant of non-competition must fail as a matter of law because the implied covenant directly conflicts with the express terms of the agreement between the parties which unambiguously provides that Barnes was granted no exclusive territory or market area, that Burger King may establish additional Burger King franchises within the vicinity of Barnes' restaurant, and that Burger King franchised restaurants "compete[ ] with other restaurant businesses which may include Burger King restaurants operated by BKC and other Burger King franchisees." UFOC at ¶ 12; *see* Franchise Agreement at ¶ 1; *see also* Section F, 1, a, *infra.* This Court finds, therefore, that viewing the undisputed facts in the light most favorable to Barnes, Burger King is entitled to judgment as a matter of law that it is not liable to Barnes for breach of an implied covenant of non-competition in the agreement between the parties. Accordingly, the Magistrate Judge's Report and Recommendation of October 13, 1995 is AFFIRMED as to Count IV of the Complaint, and Burger King's Motion for Summary Judgment is GRANTED as to Count IV.

F. *Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing*

In Count V of the Complaint, Barnes alleges that Burger King breached the implied covenant of good faith and fair dealing inherent in the Franchise Agreement between the parties by advising Barnes of its intent to permit another Burger King franchise to open in close proximity to Barnes' franchise. Complaint at ¶¶ 64–65. In its Motion for Summary Judgment, Burger King asserts that Barnes' claim based on the implied covenant of good faith and fair dealing must fail as a matter of law because, under the express terms of the Franchise Agreement, Burger King reserved the right to open additional Burger King restaurants in the vicinity of Barnes' restaurant. Barnes responds that the Court should follow the decision in *Scheck v. Burger King Corp.,* 798 F.Supp. 692 (S.D.Fla.1992), in which the Court rejected Burger King's reliance on the language in the Franchise Agreement providing that the franchisee was not entitled to exclusive territorial interests as grounds for a motion for summary judgment on the franchisee's claims of breach of the covenant of good faith and fair dealing. Barnes also argues that Burger King has given no compelling reason why *Scheck* should be overturned and that any assertions by Burger King based on the terms of the UFOC must fail because the UFOC is not a part of the Franchise Agreement.

The Magistrate Judge found that Barnes fails to state a cause of action under Florida law for breach of the implied covenant of good faith and fair dealing on the grounds that Judge Marcus's recent decision in *Burger King Corp. v. Weaver,* Case No. 90–2191–CIV–MARCUS (S.D.Fla. Sept. 18, 1995), was applicable to the facts of this case and mandated dismissal of Barnes' claim. Barnes objects to the Magistrate Judge's Report on the grounds that Judge Marcus' decision in *Weaver* is erroneous and that the Magistrate Judge's attempt to distinguish the facts of *Weaver* from those in *Scheck* is futile. Burger King responds that the *Weaver* decision is supported by substantial case law advocating the same conclusion and that ample case law also supports the position that the provisions of the UFOC may be viewed as evidence of the meaning of the Franchise Agreement.

For the reasons discussed below, this Court agrees with the Magistrate Judge that Barnes' claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

1. *The Implied Covenant of Good Faith and Fair Dealing*

At the outset, the Court acknowledges that Florida contract law recognizes

the implied covenant of good faith and fair dealing in every contract. *See, e.g., Scheck v. Burger King Corp.,* 798 F.Supp. 692 (S.D.Fla.1992); *East Bay Ltd. Partnership v. American General Life & Accident Ins. Co.,* 744 F.Supp. 1118, 1122 (M.D.Fla.1990), *aff'd without opinion,* 937 F.2d 619 (11th Cir. 1991); *Green Cos., Inc. of Florida v. Kendall Racquetball Invs., Ltd.,* 560 So.2d 1208, 1210 (Fla. 3d Dist.Ct.App.1990); *Harrison Land Development, Inc. v. R and H Holding Co., Inc.,* 518 So.2d 353 (Fla. 4th Dist.Ct.App. 1987). Generally, the covenant of good faith has evolved as a tool for protecting the reasonable expectations of the contracting parties in light of their express agreement. *See Burger King Corp. v. Austin,* 805 F.Supp. 1007 (S.D.Fla.1992) *(citing Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958 (1984)); *see also Restatement (Second) of Contracts* § 205(a) (1979). The application of the covenant of good faith, however, is not without limits, and there are many circumstances under which courts will not allow a party to pursue a cause of action for breach of the implied covenant. Two such circumstances have come to light in the motion now before the Court: (1) where application of the covenant would contravene the express terms of the agreement; and (2) where there is no accompanying action for breach of an express term of the agreement.

### a. *Where Enforcement of the Implied Covenant Contravenes Express Terms*

The implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties. *See, e.g., Fickling v. Burger King,* 1988 WL 30675 [1987–1989 Transfer Binder] Bus. Franch.Guide (CCH) ¶ 9099, at 18,824–18, 825 (4th Cir.1988) ("Under Florida law, the obligation of good faith will not be implied in derogation of the express terms of a contract."); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir. 1984) (implied obligation of good faith should not be used to override express terms of the contract); *Neuman v. Pike,* 591 F.2d 191, 194 (2d Cir.1979) *(citing and applying* New York law); *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 957 (5th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) *(citing and applying* New York law); *Dickey v. Holiday Inns of America, Inc.,* 226 So.2d 406, 407 (Fla. 4th Dist.Ct.App.1969). Although this Circuit has not yet expressed a position on this issue, the Court notes that several courts in this District have addressed the issue and have declined to oppose the position expressed in the aforementioned cases. For example, in *Scheck,* Burger King urged the Court to adopt the position that the covenant should not be applied in derogation of the express terms of the Franchise Agreement, citing the *Fickling* decision. *Supra.* There, Judge Hoeveler expressed disagreement with the factual conclusions reached in *Fickling* but declined to depart from the *Fickling* court's legal conclusions: "[T]his Court does not issue a ruling that in any way challenges Defendant's oft-cited rule of law that the covenant of good faith cannot be implied in derogation of the express terms of the contract ... [T]his Court is not in any way suggesting that the legal propositions articulated by the *Fickling* court are flawed, but rather, this Court is departing from the *Fickling* court's reading of the language of the Franchise Agreement." *Scheck,* 798 F.Supp. at 696 and 699; *see also Austin,* 805 F.Supp. at 1012.

▮ Thus, under the facts of this case, if the express terms of the contract provide that Burger King was entitled to open additional Burger King franchises in the vicinity of Barnes' franchise, then, as a matter of law, this Court will not enforce Barnes' claim for breach of the implied covenant of good faith based on Burger King's opening of an additional franchise in derogation of those express terms.

### b. *Where There Is No Claim For Breach of An Express Provision*

This Court agrees with Judge Marcus' position in *Burger King Corp. v. Weaver,* CASE NO. 90–2191–CIV–MARCUS (S.D.Fla. Sept. 18, 1995), *reh'g denied,* December 20, 1995, that a party cannot maintain a claim for breach of the implied covenant of good faith where the party cannot

claim a breach of any express contractual provision.[4] Judge Marcus held:

> We agree with the court's conclusion in *Burger King v. Holder,* [844 F.Supp. 1528 (S.D.Fla.1993) ], that a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached. Weaver has not and cannot claim breach of any express contractual provision.

*Weaver,* CASE NO. 90–2191–CIV–MARCUS at p. 13. This conclusion is consistent with other decisions in this and other Circuits. For example, in *Burger King Corp. v. Holder,* Judge Nesbitt held that "the implied covenant of good faith and fair dealing is not actionable absent a breach of the contract's express terms." *Holder,* 844 F.Supp. at 1530. The Eleventh Circuit took the same position in *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414 (11th Cir.1990), in which the court held that the covenant is not an independent contract term but, rather, "[i]t is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure.*" *Id.* at 1429. The *Alan's* court concluded that "[the covenant] is not an undertaking that can be breached apart from those [express] terms." *Id.; see also Orthomet, Inc. v. A.B. Medical Inc.,* 990 F.2d 387, 392 (8th Cir.1993) ("under either Minnesota or Florida [law] a cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim.") (*citing Kelly v. Gill,* 544 So.2d 1162, 1164 (Fla. 3d Dist.Ct.App.1989), *rev. denied,* 553 So.2d 1165 (Fla.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990)).

Thus, under the facts of this case, if Barnes is unable to maintain a claim for breach of the express terms of the Franchise Agreement, then Barnes cannot maintain a claim for breach of the implied covenant of good faith.

**2. The Terms of the Franchise Agreement**

For the reasons discussed in Section D, *supra,* this Court finds that under the Franchise Agreement between Burger King and Barnes, Burger King was entitled to open additional Burger King franchises in the vicinity of Barnes' franchise. This finding is based on the express language of the Franchise Agreement which explicitly states that Barnes is not entitled to any territorial or area rights and which in no way provides that Burger King is not entitled to open additional franchises in the vicinity of Barnes' franchise. *See* Section D, *supra.* This finding is also based on the terms of the UFOC which expressly provides that "[Burger King] may, in its discretion, establish additional Burger King restaurants operated by BKC and/or other BKC franchisees in the vicinity of a franchisee's restaurant." UFOC at ¶ 12. By signing the Franchise Agreement, Barnes acknowledged having received the UFOC (Franchise Agreement at p. 1, ¶ E), and Barnes acknowledged in writing on May 25, 1991 his receipt of the UFOC. *See* Affidavit of Elliot C. Tunis in Support of Burger King's Motion for Summary Judgment (hereinafter "Tunis Affidavit"), Exhibit G.

Although the unambiguous terms of the Franchise Agreement adequately establish that Burger King may open additional franchises in the vicinity of Barnes' franchise, the terms of the federally mandated UFOC may be considered as evidence of the meaning of provisions of the Franchise Agreement. *See TCBY Systems, Inc. v. RSP Co.,* 33 F.3d 925, 929 (8th Cir.1994) (finding that it is proper to look to a franchisor's brochure as evidence of the meaning of the site selection provision of the parties' Franchise Agreement); *Brennan v. Carvel Corp.,* 929 F.2d 801 (1st Cir.1991) (finding that it is proper to look at a franchisor's disclosure statement in determining the intent of the agreement); *Chicago Premium Yogurt, Inc. v. Yogurt Ventures, U.S.A., Inc.,* No. 91 C 0209, 1992 WL 3705 at *2 (N.D.Ill. Jan. 2, 1992) (UFOC properly con-

---

**4.** This Court will address Judge Marcus' reasoning and conclusions with respect to the terms of the Burger King Franchise Agreement below.

sidered in assessing whether failure to approve assignment of franchise was a breach of the Franchise Agreement); *Peterson v. Mister Donut of Am., Inc.*, No. 87–3205 (AET), 1988 WL 71734 (D.N.J. July 6, 1988); *Thompson v. Atlantic Richfield Co.*, 663 F.Supp. 206, 209–10 (W.D.Wash.1986); *see also* 16 C.F.R. § 436.1(a)(13) (requiring disclosure of terms of territorial protection in UFOC); Statement of basis and Purpose Relating to Disclosure Requirements and prohibitions Concerning Franchising and Business opportunity Ventures, 43 Fed.Reg. 59621–733 (Dec. 21, 1978), reprinted in Bus. Franchise Guide (CCH) ¶ 6330 (stating that the purpose of the UFOC provision regarding territorial protection is "to fully inform the prospective franchisee of the exact nature of such 'territorial protection.'"). Therefore, as Burger King was entitled under the terms of the Franchise Agreement to open additional franchises in the vicinity of Barnes' restaurant, Burger King is entitled to judgment as a matter of law on Barnes' claim based on breach of the implied covenant of good faith because, as discussed in Section F, 1, a, *supra*, this Court will not enforce an implied covenant of good faith and fair dealing in the Franchise Agreement where doing so would contravene the express terms of the agreement, and, as discussed in Section F, 1, b, *supra*, this Court finds that a party cannot maintain a claim for breach of the implied covenant of good faith and fair dealing where the party cannot claim a breach of any express contractual provision.

### 3. *Conclusion*

Based on the foregoing, this Court finds, viewing the undisputed facts in the light most favorable to Barnes, that Burger King is entitled to judgment as a matter of law as to Count V. Accordingly, this Court finds that the Magistrate Judge's October 13, 1995 Report and Recommendation is AFFIRMED as to Count V, and Burger King's Motion for Summary Judgment is GRANTED as to Count V.

### G. *Count VII: Promissory Estoppel*

In Count VII of the Complaint, Barnes alleges that, prior to the execution of the Franchise Agreement with Barnes, Burger King specifically promised Barnes that it would not permit any other Burger King restaurants to be opened within two (2) driving miles and one (1) walking mile of Barnes' restaurant and that Burger King reinforced said promise by sending the July 21 letter with the intent of inducing Barnes to enter into the Franchise Agreement. Barnes further alleges that he detrimentally relied on Burger King's assurances with respect to the encroachment policy by spending large sums of money to open up his Burger King franchise. Barnes asserts that Burger King's promise must be enforced or Burger King must compensate Barnes for his expenditures made in reliance on Burger King's alleged promise. Complaint ¶¶ 71–75.

In its Motion for Summary Judgment Burger King asserts that Barnes' claim based on promissory estoppel must fail as a matter of law because Barnes' reliance on Burger King's alleged promises regarding the encroachment policy were not reasonable and because the alleged promise is too indefinite to support an estoppel claim under Florida law. Barnes responds only that the alleged promise was not vague but, rather, laid out a clear and concise encroachment policy. The Magistrate Judge recommends that Burger King's Motion for Summary Judgment be granted on the grounds that Barnes could not have justifiably relied on Burger King's alleged oral promises or the July 21 letter regarding the encroachment policy for the same reasons set forth in the analysis of Barnes' fraud claims (the existence of contrary statements in the UFOC and Franchise Agreement and the obvious fact that there were already other Burger King restaurants within the specified radius). Barnes objects to the Magistrate Judge's Report on the grounds that the UFOC provisions denying territorial exclusivity are not inconsistent with the terms of the July 21 letter, that a merger clause is ineffective to negate liability for fraud, and that the existence of other Burger King restaurants in the designated radius is irrelevant as Barnes was only concerned with the prospect of additional franchises in the vicinity. (The same arguments asserted in Barnes' Objections to the Magis-

trate's Report with respect to the fraud in the inducement claim).

 This Court agrees with the Magistrate Judge that Burger King is entitled to judgment as a matter of law with respect to Barnes' claims based on promissory estoppel for the following reasons. The elements of a claim for promissory estoppel in Florida are (1) a misrepresentation by the promisor of a material fact which he should reasonably expect would induce action or forbearance by the promisee; (2) reliance on the misrepresentation by the promisee; and (3) action or forbearance by the promisee to his detriment caused by his reliance on the misrepresentation. *See W.R. Grace & Co. v. Geodata Services*, 547 So.2d 919, 924 (Fla.1989). As Burger King points out, the promisee's reliance must be reasonable and justifiable under the circumstances. *Id.* Barnes' claim for promissory estoppel is based on Burger King's alleged promise that it had an encroachment policy pursuant to which it would not permit any other additional Burger King franchises to be built within a specified radius of Barnes' franchise. According to Barnes, this promise was made orally to him by a Burger King representative, Jeffrey G. Harding, at a meeting with Barnes and Barnes' real estate broker, Michael G. O'Brien, on July 21, 1992. Barnes further alleges that the promise was reinforced in the July 21 letter from Harding to O'Brien, of which Barnes received a copy. For the reasons set forth in Section A, 2, a, *supra*, this Court finds that Barnes' reliance on Harding's alleged oral representations regarding the encroachment policy and on the July 21 letter was unreasonable and unjustifiable as a matter of law. Therefore, Barnes' claims based on reliance on these alleged misrepresentations or promises cannot serve as the basis for a claim of promissory estoppel.

Accordingly, this Court finds that the Magistrate Judge's October 13 Report and Recommendation is AFFIRMED as to Count VII of the Complaint, and Burger King's Motion for Summary Judgment is GRANTED as to Count VII.

### V. CONCLUSION

Based on the foregoing facts and conclusions, it is hereby

ORDERED AND ADJUDGED that the Magistrate Judge's Report and Recommendations of October 13, 1995 and January 5, 1996 are AFFIRMED as to their recommendations regarding Defendant Burger King's Motion for Summary Judgment (D.E.124) and Burger King's Motion for Reconsideration (D.E.172). Accordingly, it is further

ORDERED AND ADJUDGED that Defendant Burger King's Motion for Summary Judgment is GRANTED as to Counts I, III, IV, V, VI, and VII of the Complaint and DENIED as to Count II. It is further

ORDERED AND ADJUDGED that the parties shall submit a renewed Joint Pretrial Stipulation concerning the remaining issues in this cause, Count II of the Complaint, no later than fifteen (15) days from the date of this Order.

DONE AND ORDERED.